1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10                San Francisco Division

11

GREENIE A. WEAVER,
12                                          Case No. 3:14-cv-03654-LB
             Plaintiff,
13                                          **ORDER GRANTING DEFENDANTS'**
      v.                                    **MOTION FOR SUMMARY JUDGMENT**
14
CITY AND COUNTY OF SAN                      Re: ECF No. 93
15  FRANCISCO, et al.,

16              Defendants.

17                    **INTRODUCTION**

18        The plaintiff Greenie Anthony Weaver sued the City and County of San Francisco (the

19  "County"), San Francisco Police Officers Daniel O'Brien and Sean McNamara, Deputy Sheriffs

20  William Rold and Jason Moore, and Sheriff Ross Mirkarimi, alleging thirteen federal and state

21  claims arising out of his arrest and subsequent detention.  (First Amended Complaint ("FAC"),

22  ECF No. 77.[1])  He alleges the following violations of the Fourth and Fourteenth Amendments to

23  the U.S. Constitution: 1) Officers O'Brien and McNamara arrested him without probable cause

24  (claim one); 2) Deputy Rold and Sheriff Mirkarimi used excessive force while he was in custody

25  (claim two); and 3) the sheriffs were deliberately indifferent to his serious medical needs while he

26  was in custody (claim three). (*Id.* at 7-12.)  He also alleges that the County, Deputy Moore, and

27  _____

28        [1] Citations are to the Electronic Case File ("ECF"); pin cites are to the ECF-generated page
numbers at the tops of documents.
ORDER (No. 3:14-cv-03654-LB)

Sheriff Mirkarimi conspired to deprive him of his constitutional rights in violation of 42 U.S.C. § 1985 (claim four), which caused the excessive-force and medical injuries alleged in claims two and three, and he claims that the County and the Sheriff failed to train its jail personnel adequately and ratified their unconstitutional conduct, in violation of *Monell v. Dep't of Soc. Servs.*, 436 U.S.658, 690 (1978) (claims five and six).  (*Id.* at 13-17.) The state claims are as follows: 1) Deputies Rold and Moore violated California Civil Code § 51.7 because their motivation was their perception of Mr. Weaver's race or color (claim seven); 2) the deputies and the sheriff used excessive force in violation of the Bane Act, California Civil Code § 52.1 (claim eight); 3) the deputies committed battery (claim nine); 4) all defendants are liable for intentional infliction of emotional distress (claim ten); 5) all defendants were negligent (claim eleven); 6) the County and the Sheriff are liable for negligent training (claim twelve); and 7) Officers O'Brian and McNamara defamed Mr. Weaver (claim thirteen). (*Id.* at 17-22.)

The defendants moved for summary judgment on all claims. (Motion, ECF No. 94.) The court grants the motion.

## STATEMENT

**1.  Mr. Weaver's Arrest and Subsequent Prosecution**

Mr. Weaver returned to his apartment at the Vincent Hotel in the early morning hours of March 1, 2014. (Weaver Depo. April 10, 2015, ECF No. 103-1 ("Exhibit A.1"), at 90:23, 92.) Mr. Weaver lived in apartment number 221, and Ms. Howard lived in room 226. (*Id.* at 12:5-8; 99:19-19.) As he went to his apartment, Ms. Howard asked to borrow his lighter. (*Id.* at 91:17-21.) Mr. Weaver lent his lighter to Ms. Howard and continued to his apartment. (*Id.* at 90:25-91:1; 89:17-25.) Mr. Weaver returned to Ms. Howard's apartment after approximately ten to fifteen minutes. (*Id.* at 91:2-9.) He asked her to return his lighter but she refused, telling him "she wasn't finished using it." (*Id.* at 99:15-18.) Ms. Howard invited Mr. Weaver inside her apartment. (*Id.* at 99:25.)

While inside the apartment, Mr. Weaver sat on a chair and Ms. Howard sat on her bed; she smoked crack cocaine. (*Id.* at 100:1; 100:17-21; 102:8-15.) After approximately ten minutes, Mr. Weaver began to leave but Ms. Howard blocked the door. (*Id.* at 103:9-11.) He asked her to move but she would not let him out, so he sat back down. (*Id.* at 103:21; 104:13-20.)

United States District Court
Northern District of California

1    Mr. Weaver tried to leave the apartment a second time. (*Id.* at 105:2-6.) When he "went for the

2    door, she pushed [him] and almost pushed [him] out [the] window." (*Id.* at 105:5-6.) Ms. Howard

3    pushed Mr. Weaver with both of her hands into his chest and Mr. Weaver stuck out his arm to

4    prevent falling out of the window. (*Id.* at 105:15-17; 110:12.) After Mr. Weaver hit the window,

5    he called for the police. (*Id.* at 112:22-25.) At the same time, Ms. Howard called for Sylvester, a

6    neighbor and a "crook." (*Id.* at 112:24-113:1-3.) Sylvester unsuccessfully tried to open the door,

7    then went to the front desk and called the police. (*Id.*at 113:7-12.)

8    Mr. Weaver tried to leave Ms. Howard's apartment a third time. (*Id.* at 117:20-25.) This time

9    she grabbed him around his waist with both hands. (*Id.* at 118:1-8.) Ms. Howard continued to

10   prevent Mr. Weaver from leaving her apartment "until she heard [the police] radio" outside of the

11   apartment. (*Id.* at 115:14-19.) She then moved from the doorway, and Mr. Weaver left. (*Id.*)

12   San Francisco Police Officers Daniel O'Brien and Sean McNamara were on uniformed patrol

13   out of the Tenderloin Station and responded to the reported fight in Vincent Hotel room 226.

14   (McNamara Decl., ECF No. 97, ¶¶ 2-3; O'Brien Decl., ECF No. 98, ¶¶ 2-3.) When the two

15   officers arrived at the hotel, they saw Mr. Weaver standing in the hallway and "recognized [him]

16   from prior encounters." (*Id.*) The two officers made contact with Mr. Weaver. (*Id.*) Mr. Weaver

17   refused to answer questions from the officers. (Exhibit A.1, 132:12-15.) Instead, he told them to

18   "[t]alk to [his] lawyer." (*Id.* at 131:23-24.)

19   Officer McNamara spoke with Ms. Howard. (Decl. of McNamara at ¶ 5; Decl. of O'Brien at ¶

20   5.) She told him that "Mr. Weaver came to her room in search of sex[,] . . . that she refused his

21   advances," and Mr. Weaver "became aggressive." (*Id.*) "Ms. Howard told [Officer McNamara]

22   that [Mr. Weaver] grabbed her by the arms and forced her up against a window." (*Id.*) She also

23   claimed that Mr. Weaver grabbed her breasts, unzipped her jacket, drew a knife, and cut her

24   finger. (*Id.*) Finally, "she was able to force Mr. Weaver out of her room." (*Id.*)

25   While Officer McNamara spoke with Ms. Howard, both he and Officer O'Brien noticed

26   "superficial cuts to her face, a cut on her finger[,] and that she was sweating profusely." (*Id.* ¶ 6.)

27   Based on the officers' training and experience, it appeared to both of them that "Ms. Howard had

28

United States District Court
Northern District of California

1    recently been in a fight." (*Id.*) The officers searched Mr. Weaver and found a knife. (Exhibit A.1 at

2    144:2-10.)

3        "Based on the facts available to [the officers] at the scene, [the officers] believed there was

4    probable cause to arrest [Mr. Weaver] for violations of California Penal Code Sections 220(a)(1)

5    (assault with intent to commit rape), 236 (false imprisonment), 245(a)(1) (assault with a deadly

6    weapon, 243.4(a) (sexual battery)[,] and 12011(b)(1) (deadly weapon bail enhancement)." (*Id.* ¶

7    7.) The officers arrested Mr. Weaver for these violations. (*Id.*)

8        A preliminary hearing was held on March 18, 2014. (Transcript, ECF No. 95-1.[2]) Ms. Howard

9    testified about the events of March 1, 2014; she gave the only testimony. (*Id.*) The court found that

10   there was probable cause to believe that Mr. Weaver had committed the following crimes:

11   • California Penal Code § 220(a)(1) (assault with intent to commit rape)

12   • California Penal Code §§ 12022(b)(1), 12022.3(a), (b) (weapon enhancement)

13   • California Penal Code § 243.4(a) (sexual battery)

14   • California Penal Code § 245(a)(1) (assault with deadly weapon)

15   • California Penal Code § 236 (false imprisonment)

16   (*Id.* at 116:14-117:23.) The court found that there was insufficient evidence to support probable

17   cause to believe that Mr. Weaver had violated California Penal Code § 211 (robbery). (*Id.* at

18   117:2-4.) On May 21, 2014, the district attorney's office dismissed the charges because "it was

19   unable to sustain its burden of production of evidence against [Mr. Weaver] to proceed with trial."

20   (First Amended Complaint ("FAC"), ECF No. 77, ¶ 29.)

21   **2. Mr. Weaver's Time in Jail**

22       Mr. Weaver was held in San Francisco County jail for 82 days. (Weaver Depo. April 10, 2015,

23   ECF No. 104-1 ("Exhibit A.2"), at 7:2-6.)

24

25

26

27   _____

     [2] The court grants the defendants' request for judicial notice at ECF No. 95 and takes notice of the

28   public records (but not disputed facts in them). *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-
     90 (9th Cir. 2001).

United States District Court
Northern District of California

1

### 2.1. Mr. Weaver's Version

2

On March 20, 2014, while in his cell, Mr. Weaver passed out and fell to the ground. (Exhibit

3

A.2 at 10:15-17; Weaver Depo October 26, 2015, ECF No. 106-1 ("Exhibit B"), 27:3-8.) A nurse

4

first responded, followed by Deputy Rold. (Exhibit A.2 at 16:19-25.) Mr. Weaver was "[lying]

5

face down when [Deputy Rold] flipped [him] over." (Exhibit B at 31:4-8.) As Deputy Rold flipped

6

Mr. Weaver, Mr. Weaver hit his head, left knee, and left arm against the cell's sink and toilet. (*Id.*

7

at 58:1-59:5.) Mr. Weaver then regained consciousness and "became aware that [he] was [lying]

8

down by the sink" and toilet. (*Id.* at 27:5-10.) Deputy Rold then grabbed Mr. Weaver's arms and

9

pulled him up. (*Id.* at 43:1-22.) Mr. Weaver, however, was sliding on the concrete floor and could

10

not get his balance. (*Id.*) Deputy Rold called Deputy Moore for assistance. (*Id.*)[3] The two deputies

11

got Mr. Weaver to his feet but Mr. Weaver continued to slide. (*Id.* at 44:20-45:1.) Deputy Moore

12

then grabbed Mr. Weaver's left arm. (*Id.* at 44:20-45:1.) Deputy Moore interlocked his fingers in

13

Mr. Weaver's, twisted the arm behind Mr. Weaver's back, and extended it straight out. (*Id.* at

14

44:20-46:1.) Mr. Weaver heard and felt his wrist pop. (*Id.* at 46:8-16.) The deputies then

15

handcuffed Mr. Weaver, sat him in a wheelchair, and took him to the medical department

16

emergency room. (*Id.* at 48:11-13.)

17

While in the medical facility, Mr. Weaver was treated by nurses; he did not see a doctor that

18

day. (*Id.* at 61:4-14.) He asked the nurses to call an ambulance and to take X-rays of his wrist,

19

"because [he] heard it pop and [it was] hurting." (Exhibit A.2 at 20:13-16.) His wrist was swollen.

20

(Exhibit B at 46:17-47:7.) The nurses did not take him anywhere or X-ray his wrist. (Exhibit A.2

21

at 20:13-24.) They checked his blood pressure, which was "sky high," and gave Mr. Weaver water

22

and an ice pack for his wrist. (*Id.* at 20:21-24.) Mr. Weaver refused to use the ice pack. (Exhibit B

23

at 61:17-22.) They then put Mr. Weaver in a "cold cell" and left him there for approximately three

24

or four hours. (Exhibit A.2 at 20:25-21:3.) "They turned the temperature in the jail down" and

25

"tried to freeze [him]." (*Id.*) Mr. Weaver told the jail medical personnel that he was hurting. (*Id.* at

26

_____

27

[3] During his deposition, Mr. Weaver could not describe what Deputy Moore looks like. (Depo. Part 2 at 36:18-21.) He identified Deputy Moore when he asked the pod officer the name of the officer who took him to the medical department. (*Id.* at 36:23-38:18.) The pod officer responded that it was Deputy Moore. (*Id.*)

28

21:13-17.) The next day, Dr. Jean Taylor Woodbury gave him Gabapentin and offered 30 mg of Motrin three times daily for nerve damage and pain. (*Id.* at 21:18-20; Exhibit B at 76:12-77:12.)

Mr. Weaver did not develop any other marks or bruises on his arm after the incident but his wrist remained swollen for a few days. (Exhibit B at 59:15-23.) After seeing Dr. Woodbury on May 21, Mr. Weaver did not see another doctor in jail for his wrist. (*Id.* at 81:2-20.) Mr. Weaver did, however, submit at least twenty requests for additional medical care. (*Id.* at 82:21-83:11.) He also requested to go to San Francisco General Hospital. (*Id.* at 83:17-22.)

After he was released from jail, Mr. Weaver had his wrist X-rayed. (Exhibit A.2 at 26:1-10.) The doctors told him that there was "a little deformity." (*Id.*) The wrist was broken and it healed, but it did not heal properly. (*Id.*) Mr. Weaver currently experiences episodes of numbness and shaking in his left hand. (Exhibit B at 94:15-22.) This happens "[a]t least five days out of a week" and started after the incident with Deputies Rold and Moore. (*Id.* at 95:16; 96:2-11.)

### 2.2. Defendants' Version

The defendants deny Mr. Weaver's account of the incident. (*See* Answer, ECF No. 81.)

First, Deputy Moore states that he was not working at the jail "on March 20, 2014 and was not assigned to work [there] in the months leading up to and immediately follow March 2014." (Decl. of Moore at ¶ 3.) Moreover, to his knowledge, he has never spoken to Mr. Weaver. (*Id.* ¶ 4.)

Second, Deputy Rold does not have "independent recollection of an interaction with" Mr. Weaver. (Decl. of Rold, ECF No. 100, ¶ 3.) Deputy Rold denies the allegations, however, because he "would remember the alleged conduct had it occurred." (*Id.*) He states that he never "kicked, punched, pushed, threw, or otherwise assaulted [Mr.] Weaver." (*Id.* ¶ 4.) If he did interact with Mr. Weaver, he "would have done so in the capacity as a first responder and with the intent of administering aid." (*Id.* ¶ 5.) Deputy Rold outlines his typical "man-down" procedures in support of his denial of Mr. Weaver's allegations:

> In situations where an inmate is "man down," I first [secure] the scene and [notify] jail medical [personnel] of a potential emergency. At that point, I make sure the inmate's life is not immediately in danger. This includes checking vital signs to determine if there is a pulse [or] if the inmate is breathing and, if not, render CPR. It is my custom and practice to wait for jail medical [personnel] to render aid once I have determined a "man down"

United States District Court
Northern District of California

inmate has a pulse and is breathing. I know that did not happen because I have acted in that manner only a handful of times.

(*Id.* ¶ 5.) Deputy Rold further declares that he "would have acted in a professional manner with the purpose of maintaining safety, security, and control in the County Jail." (*Id.* ¶ 6.)

Finally, the defendants assert that there is no evidence of Mr. Weaver's injuries. They point out that there is "no record of [Mr. Weaver] complaining of wrist pain, any objective sign of injury, or a request by [Mr. Weaver] for an ambulance." (Motion at 9.)

### 3.   Relevant Procedural History

Mr. Weaver filed his initial complaint on August 8, 2014. (Complaint, ECF No. 1.) The court appointed *pro bono* counsel for the limited purpose of helping Mr. Weaver during the settlement conference and later expanded the scope of representation to allow the filing of the FAC. (Orders, ECF Nos. 53, 65, and 73; FAC, ECF No. 77.) After the settlement conference, the court granted *pro bono* counsel's motion to withdraw. (ECF No. 92.) The defendants answered the FAC and ultimately moved for summary judgment. (ECF Nos. 81, 93.) Mr. Weaver's opposition was due on February 18, 2016, but he did not file an opposition. (*See* Docket.) The court held a hearing on March 10, 2016, and Mr. Weaver appeared by telephone. (Minute Order, ECF No. 108.)

### SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim

or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Here, Mr. Weaver did not file a response. A court may not grant a summary-judgment motion solely because the opposing party fails to file an opposition. The court still must review the sufficiency of the defendants' motion under the summary-judgment standard. *See Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003) (local rule cannot mandate automatic entry of judgment for moving party without considering whether motion satisfies Rule 56); *Henry v. Gill Indus.*, 983 F.2d 943, 950 (9th Cir. 1993) (same).

## ANALYSIS

### 1.  Arrest Without Probable Cause

Mr. Weaver alleges that Officers McNamara and O'Brien arrested and detained him without probable cause. (FAC at ¶¶ 40-46.) It is undisputed that the officers arrested Mr. Weaver. The issue is whether the officers had probable cause.

1    Probable cause to conduct a warrantless arrest exists when the police have, at the moment of

2    the arrest, "knowledge or reasonably trustworthy information sufficient to lead a person of

3    reasonable caution to believe that an offense has been or is being committed by the person being

4    arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379

5    U.S. 89, 91 (1964)). Probable cause is a "practical, nontechnical conception" based on a

6    "common-sense conclusion about human behavior," and it is a "fluid concept—turning on the

7    assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to

8    a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983) (internal citations and

9    quotations omitted). Its existence is determined under the totality of the circumstances. *Id.* at 238;

10   *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

11   The probable cause determination has two steps. First, the court considers the historical facts,

12   meaning the events that occurred leading up to the arrest. *Ornelas v. United States*, 517 U.S. 690,

13   696 (1996). Second, the court considers whether these facts, viewed from the standpoint of an

14   objectively reasonable police officer, amount to probable cause. *Id.*; *Devenpeck*, 543 U.S. at 153

15   (the objective standard means that the arresting officers' subjective intentions are irrelevant to the

16   existence of probable cause). The "evidence supporting probable cause need not be admissible in

17   court, but it must be 'legally sufficient and reliable.'" *Acosta v. City of Costa Mesa*, 718 F.3d 800,

18   825 (9th Cir. 2013) (quoting *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002).

19   Here, the officers arrested Mr. Weaver for the felony and misdemeanor violations summarized

20   in the Statement, after responding to a call reporting a fight at the Vincent Hotel. The state court

21   held a preliminary hearing where the alleged victim testified, found probable cause for felony

22   assault with intent to commit rape and three misdemeanors, and held Mr. Weaver to answer for

23   those crimes. The court does not reach the issue of whether the state court's probable-cause

24   determination is preclusive because it holds independently that from the perspective of an

25   objectively reasonable officer under the circumstances, there was probable cause.

26   The state court ultimately dismissed the case almost three months after Mr. Weaver's arrest,

27   apparently because eyewitnesses later contradicted the alleged victim's account of what happened

28   (and presumably supported Mr. Weaver's account that he was not the aggressor). (*See* ECF No.

ORDER (No. 3:14-cv-03654-LB)                    9

*United States District Court*
*Northern District of California*

1    20.) The arrest resulted in Mr. Weaver's being detained while his state case was pending, which—

2    as was obvious during this litigation—caused him considerable distress. (*See* ECF No. 21.) It does

3    not change the court's conclusion that there was probable cause, again viewed through the eyes of

4    an objectively reasonably officer at the time of the arrest. Moreover, the court in any event would

5    conclude that the officers are entitled to qualified immunity. It would not "be clear to a reasonable

6    officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 53 U.S. 194,

7    202 (2001).

8    **2.   Excessive Force**

9        Mr. Weaver claims that the deputies used excessive force while he was detained at the San

10   Francisco County jail. (*See* FAC at ¶ 48.)

11       "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that

12   amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citing *Graham*,

13   490 U.S. at 395, n. 10); *Gibson v. Cnty. of Washoe,* 290 F.3d 1175, 1197 (9th Cir. 2002). Although

14   protected by the Due Process Clause, "the Fourth Amendment sets the 'applicable constitutional

15   limitations' for considering claims of excessive force during pretrial detention." *Gibson v. Cnty. of

16   Washoe,* 290 F.3d 1175, 1197 (9th Cir. 2002) (quoting *Pierce v. Multnomah County*, 76 F.3d

17   1032, 1043 (9th Cir. 1996)). The issue thus is whether the deputies' use of force was "objectively

18   reasonable" under the Fourth Amendment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d

19   912, 921 (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

20       "Determining whether the force used to effect a particular seizure is reasonable under the

21   Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the

22   individual's Fourth Amendment interests against the countervailing governmental interests at

23   stake." *Graham*, 490 U.S. at 396 (internal citations and quotations omitted). To do so, a court must

24   evaluate the "facts and circumstances of each particular case," including the following non-

25   exhaustive factors: "[1] the relationship between the need for the force used and the amount of

26   force used; [2]] the extent of the plaintiff's injury; [3]] any effort made by the officer to temper or

27   to limit the amount of force; [4]] the severity of the security problem at issue; [5]] the threat

28   reasonably perceived by the officer; and [6]] whether the plaintiff was actively resisting."

*United States District Court*
*Northern District of California*

*Kingsley*, 135 S. Ct. at 2473 (citing *Graham*, 490 U.S. at 396). "A court must also account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 40, 547 (1979) (internal quotations omitted).

"A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* (citing *Graham*, 490 U.S. at 396); *see Graham*, 490 U.S. at 396-97 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

Here, considering the summary-judgment record (including Mr. Weaver's entire deposition), and drawing all inferences from it in favor of Mr. Weaver, the court concludes that there is no genuine issue of material fact about whether the force was excessive. From Mr. Weaver's own account, he was unconscious in his cell, face down, and regained consciousness only when Deputy Rold responded to him and pulled him to his feet. According to Mr. Weaver, that resulted in Mr. Weaver's striking his head, knee, and arm on the sink and toilet. Then, Deputy Moore grabbed, twisted, and extended his arm, which caused his wrist to pop. The force—even though it resulted some injury to Mr. Weaver—was not excessive given Mr. Weaver's undisputed medical condition, the deputies' response to it, and the circumstances reasonably perceived by the officers at the time of the events.

Mr. Weaver testified in his deposition that his cellmate heard Deputy Rold say to a nurse ("[b]ecause the nurse could not bring me back to") to "get out of the way[,] [I'm] going to show [you] how to treat inmates." (Exhibit A.2 at 13:19-21, 16:17-17-2, 48:20-49:16.) (This was when Mr. Weaver was not conscious.) He asserts that this showed Deputy Rold's intent to "twist[]

1   [him] up" and engage in "[p]olice brutality." (*Id.* at 13:23-25.) The cellmate's account is

2   inadmissible hearsay. In any event, the standard is whether Deputy Rold's conduct was objectively

3   reasonable. *See Kingsley,* 135 S. Ct. at 2473 ("[T]he appropriate standard for a pretrial detainee's

4   excessive force claim is solely an objective one.") On this record, the court concludes that Mr.

5   Weaver has not shown a genuine issue of material fact that the deputies' conduct was not

6   objectively reasonable.

7   **3.   Medical Treatment**

8           Mr. Weaver also claims that jail deputies were deliberately indifferent to his serious medical

9   needs while he was in custody, alleging that he never received any real treatment (despite his

10  tremendous pain) except for pain medication, and even that was several days after he sustained his

11  injuries. (*See* FAC ¶¶ 56-58.)

12          As a pre-trial detainee, Mr. Weaver's right to adequate medical treatment is guaranteed by the

13  Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's prohibition on

14  cruel and unusual punishment. *Gibson v. Cnty of Washoe,* 290 F.3d 1175, 1187 (9th Cir, 2002).

15  With respect to medical needs, however, "the due process clause imposes, at a minimum, the same

16  duty the Eighth Amendment imposes: 'persons in custody ha[ve] the established right to not have

17  officials remain deliberately indifferent to their serious medical needs." *Id.* (quoting *Carnell v.*

18  *Grimm,* 74 F.3d 977, 979 (9th Cir. 1996)). The issue therefore is whether there is sufficient

19  evidence for a reasonable jury to conclude that the defendants were deliberately indifferent to Mr.

20  Weaver's serious medical needs.

21          A jail official violates the Eighth Amendment only when two requirements are met: 1) the

22  deprivation alleged is, objectively, sufficiently serious, and 2) the official is, subjectively,

23  deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 834

24  (1994). For the objective prong, the plaintiff "must show a serious medical need by demonstrating

25  that failure to treat a prisoner's condition could result in further significant injury or the

26  unnecessary and wanton infliction of pain." *Wilhelm v. Rotman,* 680 F.3d 1113, 1122 (9th Cir.

27  2012) (citations and quotations omitted). For the subjective, or "deliberate indifference" prong, the

28  official must "know of and disregard an excessive risk to inmate health or safety; the official must

United States District Court
Northern District of California

1    both be aware of the facts from which the inference could be drawn that a substantial risk of

2    serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. To do so, the

3    plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible

4    medical need and (b) harm caused by the indifference." *Whilhelm*, 680 F.3d at 1122.

5          Generally, "deliberate indifference may appear when prison officials deny, delay or

6    intentionally interfere with medical treatment, or it may be shown by way in which prison

7    physicians provide medical care." *Id.* (citation and internal quotations omitted). The doctrine is,

8    however, limited. *Id.* "An *inadvertent* failure to provide adequate medical care does not, by itself,

9    state a deliberate indifference claim." *Id.* (emphasis in original) (internal quotations omitted). For

10   example, negligent diagnosis or treatment of a medical condition is not itself sufficient. *Id.* (citing

11   *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

12         In *Estelle v. Gamble*, the defendants' failure to conduct certain diagnostic tests or provide

13   specific forms of treatment did not constitute deliberate indifference. 429 U.S. at 107-08. In that

14   case, the defendants treated the plaintiff-prisoner for a back injury, high blood pressure, and heart

15   problems. *Id.* at 107. The defendants "diagnosed [the plaintiff's] [back] injury as a lower back

16   strain and treated it with bed rest, muscle relaxants[,] and pain relievers." *Id.* The plaintiff argued,

17   however, that more should have been done. *Id.* The decision of "whether an X-ray or additional

18   diagnostic techniques or forms of treatment is indicated is a classic example of a matter for

19   medical judgment." *Id.* As such, the decision "the decision not to order an X-ray, or like measures,

20   [did] not represent cruel and unusual punishment." *Id.* "At most, it is medical malpractice." *Id.*

21         In *Walker v. Jones*, the defendants' refusal to send the plaintiff to a hospital similarly did not

22   constitute deliberate indifference. 2010 WL 3702659 (N.D. Cal. Sep. 16, 2010). In *Walker*, prison

23   officials took the plaintiff to a safety cell and a nurse examined the plaintiff shortly thereafter. *Id.*

24   at *6. The plaintiff told the nurse that "the deputies had stepped on him," and the nurse observed

25   the plaintiff acting erratically. *Id.* The nurse "noted that [the] plaintiff had an abrasion on his left

26   cheek and that his wrist appeared slightly swollen." *Id.* The plaintiff demanded to be taken to the

27   hospital but the nurses refused. *Id.* The nurses were not deliberately indifferent to the plaintiff's

28   serious medical needs because they promptly examined him, determined he suffered no serious

United States District Court
Northern District of California

injuries, monitored his behavior, and repeatedly sought advice from mental health professionals. *Id.* at *7. The plaintiff's "insistence that [the] defendants should have taken him to a hospital rather than maintained him in the safety cell at most states a claim for negligence not cognizable under § 1983." *Id.*

Here, and applying *Estelle* and *Walker*, there is no genuine issue of material fact that the defendants were deliberately indifferent to Mr. Weaver's serious medical needs. The deputies responded to the medical situation and took Mr. Weaver to the medical facility emergency room immediately after the events causing his injury. There, the nurses took his blood pressure, gave him water, and gave him ice for his wrist (ice that he declined). They put him in a "cold room" for a period of three to four hours, most likely for observational purposes. Dr. Woodbury met with Mr. Weaver the following day. He prescribed Gabapentin and 30 mg of Motrin three times daily for pain and nerve damage.[4]

Mr. Weaver believes that he broke his wrist, that it healed improperly, and that there is a resulting deformity and continuing numbness and shaking in his hands. From his own account, his swelling subsided after a few days and showed no signs of injury. He had an X-ray after his release. The medical records that he submitted as part of his initial disclosures dated in October 2014 contain a diagnosis of "wrist pain, chronic" and a sprained wrist; the X-rays show "[N]o evidence of acute fracture or malalignment" and "chronic posttraumatic deformity of the fifth metacarpal." (ECF Nos. 16 at 12, 16-1 at 1.) What this boils down to is that Mr. Weaver alleges, like the plaintiffs in *Estelle* and *Walker*, that the defendants should have done more (such as X-ray his wrist and take him to the hospital). The court is not discounting Mr. Weaver's account of his many medical issues and the strain and pain that these events caused him. But he has not shown a genuine issue of material fact regarding deliberate indifference to his serious medical needs.

### 4. Civil Conspiracy

Mr. Weaver claims that the County defendants conspired to violate his constitutional rights. (FAC at ¶¶ 61-69.)

---

[4] Mr. Weaver's FAC also states that he received pain medications, including morphine, while in jail. (FAC at ¶¶ 57-58.)

1   "To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the

2   existence of an agreement or meeting of the minds' to violate constitutional rights." *Crowe v.*

3   *Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Envtl. Ctr. v.*

4   *Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999)). "Such an agreement need not be overt,

5   and may be inferred on the basis of circumstantial evidence such as the actions of the defendants."

6   *Id.* (quoting *Mendocino Envtl. Ctr.*, 192 F.3d at 1301). "Whether defendants were involved in an

7   unlawful conspiracy is generally a factual issue." *Mendocino Envtl. Ctr.*, 192 F.3d at 1301-02

8   (citation omitted). Nevertheless, "the plaintiff must state specific facts to support the existence of

9   the claimed conspiracy." *Burns v. Cnty. of King*, 883 F.2d 819, 821 (9th Cir. 1989) (citing

10   *Coverdell v. Dep't of Soc. and Health Servs.*, 834 F.2d 758, 769 (9th Cir. 1987)); *see also*

11   *Maceachern v. City of Manhattan Beach*, 623 F. Supp. 2d 1092, 1110 (C.D. Cal. 2009). "To be

12   liable, each participant in the conspiracy need not know the exact details of the plan, but each

13   participant must at least share the common objective of the conspiracy." *Crowe*, 608 F.3d at 440

14   (quoting *United Steelworkers of Am v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989)

15   (*en banc*)) (quotation marks omitted). In addition, a plaintiff must show that an "actual deprivation

16   of his constitutional rights resulted from the alleged conspiracy." *Hart v. Parks*, 450 F.3d 1059,

17   1071-72 (9th Cir. 2006) (quoting *Woodrum v. Woodward Cnty.*, 866 F.2d 1121, 1126 (9th Cir.

18   1989)) (quotation marks omitted).

19       The court granted summary judgment in favor of the defendants on Mr. Weaver's three federal

20   constitutional claims, and he thus has not established the predicate constitutional violations

21   necessary to sustain a conspiracy claim against them. Moreover, there is no direct or

22   circumstantial evidence in the record that supports the existence of a conspiracy. The court grants

23   summary judgment for the defendants.

24   **5.  *Monell***

25       Mr. Weaver asserts two grounds for his *Monell* claim against the County and Sheriff

26   Mirkarimi: 1) the defendants have a policy of inadequate training, supervision, and discipline with

27   respect to jail personnel, and 2) Sheriff Mirkarimi, as a policy-maker, ratified Deputies Rold and

28   Moore's unconstitutional use of force.

United States District Court
Northern District of California

1   Local governments are "persons" subject to liability under 42 U.S.C. § 1983 if official policy

2   or custom causes a constitutional tort. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A

3   municipality nonetheless may not be held vicariously liable for the unconstitutional acts of its

4   employees under the theory of *respondeat superior. See Bd. of County Comm'rs v. Brown*, 520

5   U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th

6   Cir. 1995). To impose municipal liability under § 1983 for a violation of constitutional rights, a

7   plaintiff must show: 1) the plaintiff possessed a constitutional right and was deprived of that right;

8   2) the municipality had a policy; 3) the policy amounts to deliberate indifference to the plaintiff's

9   constitutional rights; and 4) the policy is the moving force behind the constitutional violation. *See*

10  *Plumeau v. School Dist. # 40 County of Yamhill*, 130 F.3d 432, 4438 (9th Cir. 1997).

11  Because the court granted summary judgment in favor of the defendants on Mr. Weaver's

12  constitutional claims, Mr. Weaver has not established the predicate constitutional violations

13  necessary to sustain his *Monell* claim. Moreover, the record is silent, and thus there is no genuine

14  issue of material fact, about any failure to train, whether it amounted to deliberate indifference to

15  constitutional rights, and whether it was the moving force that resulted in Mr. Weaver's injuries

16  here. *See City of Canton*, 489 U.S. 378, 388 (1989).

17  **6.  State-Law Claims**

18  **6.1. California Civil Code § 51.7**

19  Mr. Weaver claims that Deputies Rold and Moore—motivated by their perception of his

20  race—threatened and used force against him in violation of California Civil Code § 51.7. (FAC at

21  ¶¶ 85-90.) A person has "the right to be free from any violence, or intimidation by threat of

22  violence, committed against" the person because of his or her actual or perceived race, color, or

23  national origin. Cal. Civ. Code §§ 51.7(a), 51(b) & (e)(6). There is no evidence in the record that

24  suggests a genuine issue of material fact regarding an impermissible motive. Mr. Weaver points to

25  his cellmate's account of Deputy Rold's telling the nurse that he would "show them how to treat

26  inmates." (Exhibit A.2 at 16:19-25; *see supra*.) Even if Mr. Weaver presented this inadmissible

27  hearsay in admissible form, it is about Mr. Weaver's status as an inmate, not his status as a

28  protected member of a class under California Civil Code §§ 51.7 and 51.

United States District Court
Northern District of California

**6.2. Bane Act Claim**

Mr. Weaver claims that Deputies Rold's and Moore's use of force interfered with his civil rights guaranteed by the California Constitution and actionable under California's Bane Act (Cal. Civ. Code § 52.1). (FAC at ¶¶ 91-97.) Because the court grants summary judgment for the defendants on Mr. Weaver's excessive-force claims, it also grants summary judgment to them on the Bane Act claim. *See Ayala v. City of South San Francisco*, No. C 06-02061 WHA, 2007 WL 2070236, at *13 (N.D. Cal. July 13, 2007).

**6.3. Battery**

Mr. Weaver alleges battery for the deputies' use of force. (FAC at ¶¶ 98-103.) "A battery is any intentional, unlawful and harmful contact by one person with the person of another. A harmful contact, intentionally done, is the essence of a battery. A contact is 'unlawful' if it is unconsented to." *Ashcroft v. King*, 228 Cal. App. 3d 604, 611 (1991) (internal citations omitted). To prevail on a claim for battery against the deputies, a plaintiff must establish that the deputies used excessive force. *Ayala v. City of South San Francisco*, No. C 06-02061 WHA, 2007 WL 2070236, at *13 (N.D. Cal. July 13, 2007). California uses the Fourth Amendment standard of reasonableness. *See id.* (citing *Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999)). As discussed above, there is no genuine issue of material fact that the deputies used excessive force. The court grants the defendants' motion on the claim for battery.

**6.4. Intentional Infliction of Emotional Distress**

Mr. Weaver asserts a claim for intentional infliction of emotional distress against all defendants. (FAC at ¶¶ 104-08.)

In California, "[a] cause of action for intentional infliction of emotion distress exists when there is a [1)] extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; [2)] the plaintiff's suffering severe or extreme emotional distress; and [3)] actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Kelley v. The Conco Cos.*, 196 Cal. App. 4th 191, 215 (2011). "A defendant's conduct is outrageous when it is so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (international quotation marks omitted).

1       There is no genuine issue of material fact that any defendant's conduct was extreme or

2   outrageous. Officers O'Brien and McNamara had probable cause to arrest Mr. Weaver. Deputies

3   Rold and Moore used objectively reasonable force under the circumstances. The jail medical

4   personnel provided medical treatment in response to Mr. Weaver's injuries. Again, the court does

5   not dispute Mr. Weaver's reporting that the events aggravated his PTSD symptoms and were

6   distressing. (*See* Exhibit A.1 at 50:11-16). But there is no evidence that any defendants engaged in

7   any outrageous conduct.

8   **6.5. Negligence**

9       Mr. Weaver asserts a claim against Officers O'Brien and McNamara for negligent

10  investigation, Deputies Rold and Moore for negligent use of force, and the County and Sheriff

11  Mirkarimi for negligent training, supervision, and retention. (FAC at ¶¶ 109-19.)

12      "In order to prove facts sufficient to support a finding of negligence, a plaintiff must show

13  that the defendant had a duty to use due care, that he breached that duty, and that the breach was

14  the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622,

15  629 (2013) (alterations omitted). "The most important of [the] considerations in establishing duty

16  is foreseeability. As a general principle, a defendant owes a duty of care to all persons who are

17  foreseeably endangered by his conduct, with respect to all risks which make the conduct

18  unreasonably dangerous." *Tarasoff v. Regens of University of California*, 170 Cal. 3d 425, 434-35

19  (1976) (internal quotations omitted)."A special relationship [exists] between jailer and prisoner,

20  imposing a duty of care [on the jailer]." *Giraldo v. California Dept. of Corr. & Rehab.*, 168 Cal.

21  App. 4th 231, 250 (2008). Prison officials therefore owe a duty of reasonable care to protect

22  prisoners and detainees from foreseeable harm. *Id.*

23      **6.5.1. Failure to Investigate**

24      The allegation in the complaint is that the police officers "were negligent in their duties to

25  thoroughly and adequately investigate and prosecute the crimes alleged against" Mr. Weaver.

26  (FAC ¶ 113.) The contention is that the officers should not have arrested him without first

27  watching the Vincent Hotel surveillance footage, which would have shown that Ms. Howard

28  dissembled. (*See* Exhibit A.2 at 2:2-21.) And it is undisputed that the district attorney's office

1    ultimately dismissed the case, apparently because it could not prove it. *See supra*. The record does

2    not contain any admissible evidence surrounding the tape or the possible identification of

3    eyewitnesses. But considering the entire transcript and information that Mr. Weaver filed as part

4    of his initial disclosures, at best, the evidence suggests that ultimately the video and eyewitness

5    evidence corroborated Mr. Weaver's account (and not the victim's account, who testified at the

6    preliminary hearing under penalty of perjury). Nothing in the record suggests that the officers

7    knew about and ignored exculpatory evidence.

8        Once an officer has probable cause, a law-enforcement officer "is not 'required by the

9    Constitution to investigate independently every claim of innocence, whether the claim is based on

10   mistaken identity or [other defense].'" *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir. 2003)

11   (quoting *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)). The officers here had probable cause,

12   and there are no facts establishing a genuine issue of material fact regarding the claim of a

13   negligent failure to investigate.

14           **6.5.2. Negligent Use of Force**

15       The court concluded that there are no genuine issues of material fact about whether the

16   deputies' use of force was objectively reasonable under the circumstances. The claims for

17   negligent use of force fail for the same reasons.

18           **6.5.3. Claim for Negligent Training and Supervision**

19       The FAC claims negligent training and supervision of deputies. (FAC ¶ 77.) There are no

20   admissible facts suggesting any genuine issue of material fact about negligent training,

21   supervision, or retention. Mr. Weaver identifies no policy or failure to train. Moreover, the

22   decisions are discretionary decisions that generally are immune under California Government

23   Code § 820.2. *See Ayala*, 2007 WL 2070236, at * 13 (collecting cases).

24       **6.6. Defamation**

25       Mr. Weaver claims that the County and Officers O'Brien and McNamara defamed him by

26   telling others that he was "accused [apparently of attempted rape], and by implication, guilty, of

27   criminal wrongdoing." (FAC ¶¶ 121, 122.) He asserts only a claim for defamation under

28

United States District Court
Northern District of California

California law and does not assert a section 1983 "defamation-plus" claim. *See Crowe v. County of San Diego*, 608 F.3d 406, 443-44 (9th Cir. 2010).

The elements of a claim for defamation under California law are 1) an intentional publication, 2) that is false, 3) defamatory, and 4) unprivileged, and 5) that has a natural tendency to injure or that causes special damage. *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007). "Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made." *Ringler Assocs. Inc. v. Md. Cas. Co.*, 80 Cal. App. 4th 1165, 1179 (Cal. Ct. App. 2000) (citing *Cunningham v. Simpson*, 1 Cal. 3d 301, 306 (1969)).

The charge of a crime is defamatory on its face. *See Boyich v. Howell*, 221 Cal. App. 2d 801, 802 (Cal. Ct. App. 1963). "A public employee acting within the scope of employment is[, however,] immune from liability for an injury caused by the employee's 'instituting or prosecuting any judicial or administrative proceeding . . . even if he acts maliciously and without probable cause." *Gillian v. City of San Marino*, 147 Cal. App. 4th 1033, 1047-48 (2007) (quoting Cal. Gov't Code § 821.6). Section 821.6 immunizes the filing, prosecuting, and preparatory actions taken for such formal proceedings. *Id.* at 1048. "An investigation before the institution of a judicial proceeding is part of the prosecution of a judicial proceeding for purposes of the statute, even if the authorities later decide not to file charges." *Id.* "The immunity applies even if the officers abused their authority" and extends to claims for malicious prosecution, defamation, and intentional infliction of emotional distress. *Id.*

Mr. Weaver alleges that people in the community attacked him because they received "published reports" about his arrest and alleged sexual assault. (Exhibit A.1 at 50:2-6.) He does not point to, and the record is silent about, evidence of 1) the false statement, 2) the means of publication, 3) who received it, or 3) whether that person understood the defamatory meaning and its application to Mr. Weaver. Moreover, his claims arise only from the officers' arrest of him. These acts were within the scope of the officers' employment and their determination of probable cause as part of the institution of criminal proceedings and thus Section 821.6 provides is "a complete defense." *Gillian*, 147 Cal. App. 4th at 1047-50 (applying rule to police officers).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

The court grants the defendants' motion for summary judgment. This disposes of ECF No. 93.

**IT IS SO ORDERED.**

Dated: March 10, 2016

_____
LAUREL BEELER
United States Magistrate Judge